

**SEALED**

**FILED**

MAY 07 2015

Phil Lombardi, Clerk
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

Civil Case No.:_____

UNITED STATES OF AMERICA,
ex. rel. SANDRA WAGNER,

                Plaintiffs/Relator

v.

CARE PLUS HOME HEALTH CARE, INC.,
PRASAD ITTY and KUMAR GOVIND,

                Defendants.

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(B)(2)**

**15 CV - 260 GKF    TLW**

**COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT
31 U.S.C. § 3730(b)(2)**

Plaintiff/Relator Sandra Wagner (hereinafter "Relator"), hereby files this Complaint under seal on behalf of the United States of America, pursuant to the Federal False Claims Act, 31 U.S.C. §3730(b)(2) and alleges as follows:

## I. INTRODUCTION

1.     This matter involves a significant ongoing fraud on the United States government through the systematic and willful disregard of Medicare rules and regulations.

2.     Care Plus Home Health Care, Inc., and its owners, Prasad Itty and Kumar Govind (hereinafter collectively "Defendants"), have in the past and continue to submit fraudulent billing to the government for home health care services in Oklahoma.

3.     Defendants have created and implemented a scheme to defraud Medicare by billing for numerous individuals who are not actually homebound and therefore are not eligible for home health care services.

4.      Defendants are systematically falsifying records, including but not limited to Outcome and Assessment Information Set (OASIS)[1] eligibility information, skilled nursing visit documentation, Plan of Care documentation (Form CMS-485), and other patient medical records, all in order to bill Medicare for services that have not been provided or are not medically necessary.

5.      The Medicare home health care program is intended to provide healthcare in the home to individuals who are generally unable to leave their home and who need skilled medical care for their illness or injury for a finite and predictable period of time.

6.      In order for a beneficiary to be eligible for these services, the individual must be *confined* to the home, under the *recent* care of a physician, and in need of *skilled* nursing care or therapy services, such as physical, language and/or occupational therapy.[2]

7.      Many of the patients on Defendants' service are not homebound, are able to drive themselves, and are able to conduct other normal day-to-day activities that clearly demonstrate that they do not qualify for or have the need for home health care.  Simply put, many of Defendants' patients do not meet Medicare's home health criteria, thus resulting in CMS paying for patients that should not be on home health services.

8.      Defendants routinely falsify home health prospective payment data by fraudulently manipulating and altering the OASIS patient information in order to inflate invoices submitted to government insurance programs.

9.      In furtherance of this scheme to defraud the government, Prasad Itty and Kumar Govind ordered and intimidated employees to "enhance" and "falsify" information entered on

---

[1] OASIS is a group of standard data elements that are collected on Medicare and Medicaid patients, 18 years or older, receiving home health skilled services.
[2] Medicare Benefit Policy Manual; Chapter 7- Home Health Services; Section 30.1.
http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c07.pdf.

the OASIS forms that was then submitted to Medicare to ensure payment was received by Defendants.

10.     Defendants' employees were directed to make patients appear much worse physically than they actually were by falsifying a variety of medical records. Employees were informed that if they did not comply with Defendants' directives; they would be fired from their positions.

11.     When Medicare has audited or requested additional information related to patients on service, Defendants regularly falsified medical records and provided those falsified documents to Medicare to assure that they will receive or keep payments to which they are not entitled.

12.     Instead of making the required refunds to the federal government for these false claims, Defendants have enjoyed the benefits of their fraudulent conduct. Defendants have in the past and continue to bill Medicare for ineligible home health care patients and for services that are unnecessary and, in fact, have not been provided in some instances.

**II. PARTIES**

**Relator Sandra Wagner**

13.     Under the False Claims Act, a person or persons with knowledge of false or fraudulent claims ('Relator') against the government may bring an action on behalf of the federal government and themselves.

14.     Plaintiff/Relator Sandra Wagner is a resident of Tulsa, Oklahoma. Ms. Wagner began working for Defendants in May 2006 as an independent contractor Registered Nurse (RN). She was offered the position of Director of Nursing or DON in the office in January 2013, and

was terminated from the company in February 2015. Ms. Wagner presently serves as Administrator/DON for Allwood Home Health in Tulsa, Oklahoma.

**Defendants**

15.     Care Plus Home Health Care, Inc., is a for-profit, privately held corporation organized under the laws of the state of Oklahoma with their headquarters at 8030 S. Memorial Drive, Suite D-1, Tulsa, Oklahoma, 74133.

16.     Prasad Itty and Kumar Govind are the  owners of Care Plus Home Health Care, Inc.  Neither Prasad Itty nor Kumar Govind have any formal medical training.  Both Defendants reside in or very close to Tulsa, Oklahoma.

**III.     JURISDICTION AND VENUE**

17.     The acts complained of herein, and proscribed by 31 U.S.C. S 3729 *et seq.* occurred in the Northern District of Oklahoma as Defendants reside in and transact business in this District. Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732 (a), as well as under 28 U.S.C. §§ 1331 and 1345.

18.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §1391 because Defendants transact business in or reside in this District, and one or more of the acts proscribed by section 31 U.S.C. §3729 occurred in this District.

19.     The facts and circumstances alleged in this complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

20.     Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act relied on herein and she has shared all

material information in support of this claim with the government or otherwise complied with all conditions precedent to bringing this action pursuant to 31 U.S.C. § 3730.

## IV.    THE NATURE OF THE CASE

21.    Relator began her employment with Defendants in May 2006 serving as an independent contractor RN.   She was offered the position of Office Director of Nursing in January 2013.

22.    Relator regularly completed patient care requirements, assured quality of care for a variety of patients, identified patient service requirements, and indirectly supervised Licensed Practical Nurses (LPNs), Home Health Aides, and other RNs involved in handling case-loads.

23.    Relator began to suspect fraudulent activity of some type in 2010 when she was brought into the office on a part-time basis and observed patient medical records being altered by Prasad Itty and Kumar Govind.

24.    Kumar Govind informed others that he was a silent partner in the corporation in order to avoid the appearance of a conflict of interest so that his wife, Dr. Kusum Bhandari, can refer patients to Care Plus Home Health Care, Inc.

25.    As a certified home health agency, Defendants were required to, and did in fact, certify on Form CMS-855A that they would abide by the Medicare laws, regulations and program instructions in order to enroll as a Medicare provider.

26.    Relator did not become fully aware that the Defendants were fraudulently billing the government until January 2013, when she was made the Office DON and given access to systems to which she previously did not have access.

27.     Relator soon realized Defendants were billing Medicare for more services than had actually been rendered and also for unnecessary services as a result of the medical record alterations.

28.     Relator determined that Defendants' business practices were designed to fraudulently maximize billing, primarily to Medicare.

29.     Defendants only accept patients who have Medicare or Humana Medicare Advantage and, on the rare occasion, Veterans Administration patients.  Defendants do not accept Medicaid or private insurance other than the Humana Medicare Advantage program due to the fact that Medicaid does not pay enough and private insurance has more oversight requirements.

30.     The Center for Medicare and Medicaid Services (CMS) defines a patient's eligibility for home health services by being "confined" to the home under the following conditions:[3]

> The patient must either because of illness or injury, need the aid of supportive devices such as crutches, canes, wheelchairs and walkers; the use of special transportation; or the assistance of another person in order to leave their home

> OR

> The patient must have a condition such that leaving his or her home is medically contraindicated.

31.     The patient must also meet both of these criteria:

> There must exist a normal inability to leave the home

> AND

> Leaving the home must require a considerable and taxing effort.

---

[3] Medicare Benefit Policy Manual; Chapter 7- Home Health Services; Section 40.1.1.
http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c07.pdf.

32.     If the patient does in fact leave the home, the patient may nevertheless be considered homebound if the absences from the home are infrequent or for periods of relatively short duration, or are attributable to the need to receive health care treatment.

33.     Absences attributable to the need to receive health care treatment include, but are not limited to:

1. *Attendance at adult day centers to receive medical care;*
2. *Ongoing receipt of outpatient kidney dialysis; or*
3. *The receipt of outpatient chemotherapy or radiation therapy.*

34.     In addition to the requirements that a beneficiary must be confined to the home, there needs to be a skilled nursing service ordered to meet the home health criteria.

35.     Skilled nursing services include those services that are necessary to maintain the patient's current condition or prevent or slow further deterioration as long as they can be delivered safely and effectively in the home.  Home health services are meant to be short term.

36.     Services are considered to be skilled when they are so inherently complex that they can only be done safely and effectively by or under the supervision of a registered nurse (RN) or provided by regulation, a licensed practical nurse (LPN) and cannot be safely or effectively done by an unskilled caregiver or patient.

37.     Under Medicare's prospective payment system (PPS), home health agencies (HHAs) are paid a predetermined base payment that is adjusted for the health condition and care needs of the beneficiary.

38.     The home health PPS provides HHAs with payments for each 60-day episode of care for each beneficiary.  If a beneficiary is still eligible for care after the end of the first

episode, a second episode can begin with no limits to the number of episodes, *as long as the beneficiary remains eligible.*[4]

39.     Eligibility is the key to the door of reimbursement under CMS rules and through their lies and falsehoods the Defendants effectively picked the lock.

40.     During her employment with Defendants, Relator independently uncovered two types of fraudulent activity:

      (a) Ineligible Patients Were Brought on and Kept on Service

      (b) Defendants Falsified OASIS Information and Medical Records

**A.     Ineligible Patients Were Brought on and Kept on Service**

41.     A majority of Defendants' patients were not eligible for home health care service but were brought on and kept on service in a fraudulent scheme to facilitate billing to Medicare for the profit of Defendants.

42.     Approximately sixty percent of the patients on service at any given time do not meet the Medicare guidelines for eligibility.  Additionally, 73% of all patients now on service have been on service for five episodes or longer, over three hundred days as one episode for certification purposes is approximately sixty days, and most of those long-term patients are ineligible for home health care.

43.     As examples of the type and extent of Defendants' fraudulent conduct, Relator identified samples of patients[5] who were not eligible for home health care services but were billed to Medicare.  These samples are described in the paragraphs which follow.

---

[4] http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/HomeHealthPPS/index.html?
[5] The actual patient names have been provided to the government.

**Medicare Patient ID 440403341B6**

44.     This patient is 69 years old and was brought onto service in 2007.  In early 2014 one of the patient's favourite nurses left Care Plus Home Health Care and started working at Angels Home Care.  The patient requested and was granted a transfer to Angels Home Care.  After less than two episode periods, Angels Home Care discharged the patient after discovering that she was not actually homebound.  After being discharged, the patient requested service once again with Defendants.  Prasad Itty directed Relator to obtain an order for home health care services from the patient's primary care physician (PCP).  Upon contacting the PCP, Dr. Matthew Stevens, Relator was told that Dr. Stevens would not provide an order because the patient was not homebound and regularly drove herself to Dr. Stevens' office.  Defendant Prasad Itty directed Relator to contact the patient's cardiologist, Dr. John Ivanoff, who provided an order for monthly Prothrombin & International Normalized Ratio (PT/INR) blood level testing and patient was readmitted to Care Plus Home Health Care on June 11, 2014.

45.     In order to appear that patient met home health skilled needs, the patient's Plan of Care reflected weekly visits for the following "exacerbated" conditions: end stage renal disease, angina (chest pain), atrial fibrillation (heart arrhythmia), emphysema, esophageal reflux, anemia, dizziness, renal dialysis and general muscle weakness.  Despite what appeared to be an infirmed condition, Relator was told by the nursing staff that this patient regularly drove herself to shop and dine out and that nursing staff had to schedule specific times to meet with the patient as she was often not at her residence when the nursing staff had arrived at the patient's residence.  The patient was not eligible for home health care services as she was not home bound and could have received the monthly blood draw at the doctor's office.

**Medicare Patient ID 447281441A**

46.     This patient is an 87-year-old patient who has been on service since October 18, 2013, after having a hip replacement.  The patient's only skilled need was for a monthly blood draw for PT/INR levels.  The patient had a paid caregiver eight hours a day, seven days a week and a daughter who routinely took him to his physician visits, so there was no need for weekly home health care visits.  Prasad Itty ordered weekly visits on this patient strictly so he could bill Medicare for unnecessary services for the last year.  The weekly visits were repetitive teaching and/or instruction while there was little to no change in the patient's condition.  This does not meet Medicare's guidelines which state,

> "*Re-teaching or retraining for an appropriate period may be considered reasonable and necessary where there is a change in the procedure or the patient's condition that requires re-teaching, or where the patient, family or caregiver is not properly carrying out the task.  The medical record should document the reason that the re-teaching or retraining is required and the patient/caregiver response to the education.*"[6]

47.     The preceding two examples are patients whose only skilled service was a monthly venipuncture or blood draw for drug levels.  In addition to both patients not meeting the "homebound" status required by Medicare, the patients were assigned weekly home health visits.

48.     In each case the 'skilled' need used to justify the additional weekly visits was patient instruction on medications for chronic conditions with no precipitating events or changes documented that would require continued repetitive training on routine medications, dosages, or side effects from one certification period to the next.

**Medicare Patient Patient ID 447188496D**

49.     This patient is an 85-year-old patient who has been on service since January 12, 2013, and remains on service to this day receiving weekly visits.  The patient's OASIS-C

---

[6] The Medicare Benefit Policy Manual; Chapter 7 Home Health Services, Teaching and Training Activities 40.1.2.3

recertification form for November 8, 2013, states that she has unspecified anemia (ICD-9 code 285.9), gastroesophageal reflux disease (GERD), and exacerbation of the following conditions: atrial fibrillation, edema, hypertension, depressive disorder, epilepsy, osteoporosis, anxiety and coronary atherosclerosis. These same conditions continue to exist almost two years later.

50.     Nurses reporting to Relator told Relator that the patient frequently left her residence with friends and/or her daughter, was hard to "catch" at home, and was not eligible for home health care services under Medicare guidelines. The patient's only documented skilled nursing need is for a once a month injection of Vitamin B-12.   However, The Medicare Benefit Policy Manual; Chapter 7 Home Health Services, Administration of Medications 40.1.2.4, states that Vitamin B-12 injections are considered therapy only for the following specified anemias: pernicious anemia, megaloblastic anemias, macrocytic anemias, and fish tapeworm anemias. The patient's diagnosis of anemia is listed as "unspecified" in the Plan of Care and OASIS-C assessment thereby calling into question the patient's actual diagnosis based upon Medicare's criteria as well as not meeting the "homebound" status for this service.

51.     In an effort to increase the utilization of home visits for this patient, Prasad Itty instructed the nurses to go out weekly and provide a skilled service.  When the nurse was not providing the monthly injection, the week-to-week home visits consisted of routine medication instruction, including over-the-counter medications such as Tylenol (acetaminophen) for arthritic pain and Prevacid for gastroesophageal reflux (heartburn), with no precipitating events or changes documented that would require continued repetitive instruction on routine medications, dosages or side effects from one certification period to the next.

52.     The patient had requested numerous times to be discharged from Care Plus Home Health Care but Prasad Itty had refused to discharge her and continued to bill Medicare for unneeded services.

**Medicare Patient ID 448404405A**

53.     This patient is a 70-year-old patient who has been on service since November 17, 2009, and remains on service to this day some five years later.  Relator, based on her experience and review of skilled nursing visits and OASIS forms, knows that this patient is not eligible for home health care as he has no skilled nursing need.

54.     The patient's OASIS-C recertification form for August 19, 2014, indicates he has a primary diagnosis of congestive heart failure and other secondary diagnoses of Diabetes Mellitus, chronic obstructive pulmonary disease (COPD), diabetic neuropathy, spinal stenosis, sciatica, morbid obesity, hypertension, venous insufficiency and depression.  Skilled nursing visits were occurring weekly for repetitive instruction on chronic conditions and assessments of a clinically stable patient.  The nurse's assessments document no acute change in the patient's conditions to warrant these visits.  He regularly rode with others to a variety of places including the doctor's office for routine care.

55.     This patient was not eligible for home health care per Medicare regulations that require a patient to be homebound as well as to require a patient's medical condition to be in need of medical procedures or treatment modifications that regular observation or assessments would be necessary to monitor.

56.     Defendants have continually billed Medicare for unnecessary services that, if truly needed, could be accomplished in an outpatient setting.

**Medicare Patient ID H42195960**

57.     This patient is a 76-year-old patient who has been on service since July 29, 2014, and remains on service to this day receiving weekly skilled nursing visits. As with many of the patients on service with Defendants, this patient had a list of chronic diagnoses to include: hypertension, depression, unspecified dementia, coronary atherosclerosis, Vitamin B-12 deficiency anemia, headache, generalized anxiety, thoracic spondylosis (degenerative disease of aging), generalized muscle weakness and dizziness.

58.     Although patient had not been on service as long as some of the other patients, she is representative of many patients on service with Defendants without a skilled nursing need. The patient lived with her husband and daughter, and was independent enough to drive and had a good support system. According to the Case Conference Summary of September 23, 2014, her husband assists with the administration of her medications. Weekly nursing visits are continuing to occur in order to pre-fill the medication planner and to provide repetitive instruction on prescriptions and chronic conditions.

59.     The pre-filling of medication planners can be an appropriate skilled nursing service for patients who are unable to complete the task themselves or that may not have someone in the home to assist with the medication administration.

60.     Defendant Kumar Govind was aware that this patient did not meet the criteria for skilled nursing care and/or being homebound, yet continues to bill Medicare for home health services.

**Medicare Patient ID 448409217A**

61.     This patient is a 72-year-old patient who has been on service since December 4, 2011, and remains on service to this day, some three years later. The OASIS-C recertification

form for November 20, 2013, states the patient has exacerbations of all of the following conditions: bipolar disorder, chronic obstructive pulmonary disease (COPD), dementia, peripheral neuropathy, gastroesophageal reflux disease (GERD), other late effects of cerebrovascular disease (history of stroke), idiopathic normal pressure hydrocephalus (increase of cerebrospinal fluid in brain), hypertension, muscle weakness and insomnia. Skilled nursing visits occurred weekly for filling the medication planner or dispenser by the licensed practical nurse (LPN).

62.     Psychiatric nursing services were being provided each week for repetitive instruction on chronic conditions and assessments on a clinically stable patient whose main complaint during the visits was insomnia. The services provided did not meet the Medicare guidelines as noted in the Medicare Benefit Policy Manual; Chapter 7 Home Health Services, 40.1.2.15- Psychiatric Evaluation, Therapy, and Teaching which state,

> "[s]ervices of a psychiatric nurse would not be considered reasonable and necessary to assess or monitor use of psychoactive drugs that are being used for non-psychiatric diagnoses or to monitor the condition of a patient with a known psychiatric illness who is on treatment but is considered stable. A person on treatment would be considered stable if their symptoms were absent or minimal or if symptoms were present but were relatively stable and did not create a significant disruption in the patient's normal living situation."

63.     This patient lived with her ex-husband at the time in a senior apartment complex and was not homebound, therefore making her ineligible for home health care services.

64.     The patient regularly left her residence such that both her nurses Ms. Barboza and Ms. Bailey, had to schedule times to meet with her as she is often absent from her residence.

65.     Defendants billed Medicare for services for which this patient should not be receiving.

**Medicare Patient ID H55489859**

66.    This patient was brought on service on January 23, 2013, and was discharged from service on December 31, 2013, when he transferred to Community Health Care.  Relator knows that this patient was not homebound while on service and continued to be ineligible for home health care services.  This patient was driving himself to outpatient physical therapy treatments but Defendant Prasad Itty had an "agreement" with the physical therapy company, the Center for Physical Therapy and Hand Rehabilitation, Tulsa, Oklahoma, to bill the treatments as home health and not as outpatient because the patient was not homebound. This was evidenced by his regular visits for outpatient services and the ability to leave his home independently, without assistance and without a taxing effort, as required by Medicare to be eligible for services.

**Medicare Patient ID 441244106A**

67.    This patient was brought on service on June 29, 2013, and remains on service to this day.  Relator was told by the physical therapy supervisor, Deena Price that this patient's physical therapy was discontinued because he was not homebound and was able to drive himself and his new spouse, any place they wanted to go.

68.    Relator was told by Lorena Barboza, (LPN), that this patient was hard to "catch" at home and that she had to schedule a time to meet him because he was often not home.  Relator knows that this patient's Form CMS-485 Plan of Care was false wherein it states "Homebound Status: Confusion, unsafe to go out of home alone, requires max assistance/taxing effort to leave home."

69.    Defendant is billing Medicare for services for which the patient is not eligible.

**Medicare Patient ID 440328103A**

70.    This patient was brought on service on February 28, 2013, and was discharged on October 29, 2014 after multiple requests.  Relator, based on her experience and review of the medical records, knows that the patient did not have a need for skilled nursing services when he was brought on service but Prasad Itty ordered the RN's to "find something" that he could use to bring him on service.

71.    After being contacted by one of the RN's, Prasad Itty had ordered to "find something," the patient's primary care physician Dr. Andrea McEachern, provided an order for home health care services.

72.    The patient had asked to be discharged from home health services, but Prasad Itty refused to allow him to be discharged in order to continue to bill Medicare for unnecessary services for which he was not eligible.

**Veterans Administration Patient ID 440403069A**

73.    The Veterans Administration (VA) patient was brought on service on April 30, 2013, and remains on service to this day.  The patient was originally brought on service after knee surgery for anticoagulant therapy which has resolved. Kumar Govind had been using a diagnosis of Lumbosacral Spondylosis, and that the patient's surgery was completed in June 2014, and the anticoagulant therapy was stopped in September 2014.

74.    The patient is not homebound and is not eligible for continued home health care services, yet Defendants continue to bill the VA for unnecessary home health care services.

**Medicare Patient ID 445786225A**

75.    The patient was brought on service on December 16, 2010, and remains on service to this day.  Relator completed OASIS recertification on this patient and knows that he

was not homebound at the time, regularly drove himself to the local casino and often had no

money for medicine due to his gambling losses.

76.     The information contained in the Form CMS-485 Plan of Care that states

"[r]equires max assistance/taxing effort to leave home, residual weakness, unable to safely leave

home unassisted, need assistance for all activities" is false and only included to make it appear as

if the patient is in fact homebound when he is not.

**B.     Defendants Falsify OASIS Information and Medical Records**

77.     In 2010, the Medicare Payment Advisory Commission (MedPAC) identified areas

related to home health staffing within the payment system that are vulnerable to billing abuses

which involve using differing levels of staffing resources, such as licensed practical nurses

(LPNs) instead of registered nurses (RNs), in order to reduce costs.[7]

78.     CMS regulations specifically state the type of person who should be completing the

OASIS.  Completing the OASIS data is part of a comprehensive assessment required by the

Medicare Conditions of Participation (CoP).  The following outlines the regulations specific to

the completion of the OASIS found in the September 2009 OASIS-C Guidance Manual:

> The discipline of the person completing the home health assessment and OASIS
> data collection should be a RN for cases involving nursing and physical therapist
> (PT), occupational therapist (OT) or speech therapist (ST) for any therapies at the
> start of care.  Any subsequent assessments should be completed in the same
> manner.  LPN/LVN, aides or social workers may not complete the assessment and
> OASIS data collection.  Chapter 1, pg. 8.
>
> *All of the assessments, with the exception of transfer to inpatient facility and
> death at home, must be conducted during a home visit because all require the
> clinician to have an in-person encounter with the patient.* (Emphasis added)

General OASIS conventions include (Chapter 1, pg. 11):

---

[7] Home Health Study Report; HHSM-500-2010-00072C; Literature Review; 2011 January 11. L&M Policy
Research prepared for CMS. http://www.cms.gov/Medicare/Medicare-Fee-for-Service-
Payment/HomeHealthpps/downloads/HHPPS_LiteratureReview.pdf.

- Only one clinician takes responsibility for accurately completing a comprehensive assessment.
- When completing the assessment, report what is true on the day of the assessment while the clinician is in the home.
- Responses to items documenting a patient's current status should be based on independent observation of the patient's condition and ability at the time of the assessment without referring back to any prior assessments.

79.     Defendants blatantly falsified OASIS recertification information and other patient medical records in a scheme to increase billings to Medicare with profit as their overriding goal.

80.     There are several areas where Defendants failed to meet the Medicare regulations as noted in the Medicare Benefit Policy Manual, Chapter 7 – Home Health Services.

81.     Defendants frequently falsified documents such as patient Plan of Cares, daily nursing visit notes, OASIS assessments, and 60-day patient conferences.  Defendants assigned false diagnoses for conditions the patients did not have in order to make it appear that the patients met criteria for continued home health services.

82.     Relator knows that Prasad Itty and Kumar Govind routinely went into the company computer system and changed nurses' diagnoses and Form CMS-485 Plan of Care medical records so that Defendants could bill Medicare for more and higher paying services.

83.     Relator has seen Kumar Govind cut out a physician's signature from a Form CMS-485 and then use it on blank Form CMS-485's to make it appear as if the physician signed the form.  When confronted, Kumar Govind laughed and brazenly told Relator that:

        *"No one will find out I did this."*

84.     When Defendants receive ADRs (additional documentation requests) from Medicare requesting further information on a patient, they go into the company's computer system to make changes on the medical records or they order their employees to falsify medical records by changing patient notes, OASIS Recertification information, and 60-day case

summaries which are then submitted to Medicare as if they are a true reporting of patient care provided.

85.     Defendant Kumar Govind has told Relator that:

*"There is nothing wrong with up-coding because the government doesn't even monitor up-coding."*

86.     Defendant Kumar Govind manages ALL of the medical coding.  Kumar Govind adds exacerbation (E) to all diagnoses except those that are new (N).  Kumar Govind, at some point, stopped adding dates so he could carryover the diagnoses from one certification to the next.

87.     All diagnoses listed on the OASIS assessment that are not marked "new" are listed as "exacerbation."  An exacerbation is defined by Medicinenet.com as "a worsening."  In medicine, exacerbation may refer to "an increase in the severity of a disease or its signs and symptoms."

88.     In an attempt to justify the weekly skilled nursing visits, the documentation on the Plan of Care (POC) were fabricated to show a repetitive pattern of instruction, observation and assessment of the patients despite the chronicity of their condition.

89.     The POCs are falsely written to reflect the patient's assessment is necessary for multiple conditions; however, the nurses' assessments do not document any fluctuating symptoms or unstable conditions that require a change in the prescribed treatment or the continuation of care.  This also includes those patients who are seen for psychiatric evaluation.

90.     The Medicare Benefit Policy Manual states that:

*"Observation and assessment of the patient's condition by a nurse are reasonable and necessary skilled services where there is a reasonable potential for change in a patient's condition that requires skilled nursing personnel to identify and evaluate the patient's need for possible modification of treatment or initiation of additional medical procedures until the patient's clinical condition and/or*

*treatment regime has stabilized."* - Chapter 7 Home Health Services 40.1.2.1-
Observation and Assessment of the Patient's Condition When Only the
Specialized Skills of a Medical Professional Can Determine Patient's Status

91.     Medicare guidelines further state that changes in signs and symptoms such as
abnormal or fluctuating lab values, vital signs, weight, edema, symptoms of drug toxicity and
respiratory changes should be reflected in the health record to reflect the need for ongoing skilled
services.  Observation and assessment by a nurse is not reasonable or necessary for the treatment
of the condition where fluctuating signs and symptoms are part of a long standing pattern of the
patient's condition which has not previously required a change in the prescribed treatment.

92.     The POCs show that patients routinely received repetitive instruction on chronic
diagnoses, routine medications and over-the-counter drugs.     Further, medical record
documentation (nurse's notes) did not describe the patient's response to the nurse's instruction
and/or the need for further reinforcement.

93.     The Medicare Benefit Policy Manual further provides:

*"Skilled nursing visits for teaching and training activities are reasonable and
necessary where the teaching or training is appropriate to the patient's functional
loss, illness or injury. Where it becomes apparent after a reasonable period of
time that the patient, family or caregiver will not or is not able to be trained, then
further teaching and training would cease to be reasonable and necessary."* -
Chapter 7 Home Health Services 40.1.2.3 Teaching and Training Activities.

and

*"Objective measurements of physical outcomes of treatment should be provided
and/or a clear description of the changed behaviors due to education programs
should be recorded in order that all concerned can follow the results of the
applied services."* - Chapter 7 Home Health Services 40.1.1- General Principles
Governing Reasonable and Necessary Skilled Nursing Care.

94.     Set forth below are examples of the type of falsification of OASIS and other
medical records that are being conducted by Defendants in order to increase billing to Medicare.
These are merely examples of the larger widespread fraud conducted by Defendants.

**Medicare Patient Patient ID 548768856A**

95.    This patient was brought on service on July 21, 2007, and remains on service to this day, some seven and a half years later.   Numerous OASIS recertification records and Nursing Visit Records were retroactively changed when Defendants received an ADR from Medicare for this patient.

96.    Skilled Nurse Visit forms and Wound Care Worksheets were completed at the time of the nursing visit.   During each visit, a wound on the lower left calf was classified with the etiology of surgical and a wound on the left ankle was classified as a non-staged pressure wound.   Upon receipt of the ADR, Kumar Govind demanded that Relator falsify the OASIS form that was submitted in response to the ADR by changing both wounds to stage four pressure wounds.

97.    Kumar Govind specifically told Relator that he was doing this to get more money from Medicare.

98.    In addition, Kumar Govind ordered Relator to change a Nursing Visit Record for the visit date of July 15, 2014.   The original record stated:

*"Patient wound care had already been done today and patient asked for me not to bandage."*

The new record that was submitted to Medicare in response to the ADR stated:

*"wound care performed (see wound sheet) without incident or difficulty."*

99.    In addition, Relator was instructed by Kumar Govind to change a Skilled Observation report dated September 9, 2014 that previously stated:

*"Patient uses santyl routinely for wound care that is provided by his daughter."*

100.    Upon review of the Nursing Visit Record of July 15, 2014 Kumar Govind knew that he could not bill Medicare for wound care provided by a skilled nurse because no actual

wound care had been performed.  With a blatant disregard for Medicare rules and regulations, Kumar Govind caused the wholesale falsification of medical records and then submitted those records to Medicare in response to the ADR to ensure that Defendants would be paid.

**Medicare Patient ID CPHC724**

101.   This patient was brought on service on May 2, 2011, and remains on service to this day. Relator, based on her position as the DON in the office, has first-hand knowledge of an OASIS Recertification form that was completed contemporaneously with the care provided on June 12, 2014.

102.   Upon receipt of an ADR, Kumar Govind ordered Relator to falsify the OASIS Recertification form so that Defendants would be assured of being paid by Medicare. Relator, under extreme pressure from Kumar Govind, reviewed the true OASIS recertification form and took notes as she went along so that she could change the OASIS that would be submitted with the ADR as ordered by Kumar Govind.

103.   At the insistence of Kumar Govind, Relator then completed a new falsified OASIS that was submitted to Medicare.  In addition, Kumar Govind demanded that Relator write up a falsified Case Conference and 60 Day Summary. Kumar Govind ordered Relator to prepare this documentation to assure that Medicare would continue to enrich Defendants.

104.   Relator knew that she would lose her position if she did not do as told by Kumar Govind, so Relator completed the Case Conference and 60 Day Summary which was also submitted in response to the Medicare ADR.

105.   On August 8, 2014, this patient suffered a fall in her garage and was taken to the hospital. On that date the patient was scheduled for a skilled nursing visit by Sharon Bailey, RN, of Care Plus Home Health Care but due to the hospitalization she missed her appointment.  The

fact that she had been hospitalized was not known by Defendants until October 1, 2014. When learning this Kumar Govind ordered Relator to add a fall report to the patient's medical records. Kumar Govind directed that the form be filled out to make it appear as if it was actually completed on the date of the fall and that Care Plus Home Health Care was fully aware of what had occurred. Kumar Govind even stamped the document with a "Faxed" stamp and filled in the date of August 9, 2014, even though the form was not completed until October 1, 2014, all with total disregard to the importance of a patient's medical record being a true history of their care and to assure that Defendants would continue to be paid by Medicare.

**Medicare Patient ID 407700015A**

106.    This patient was brought on service on February 1, 2013, and remains on service to this day. Based on Relator's experience and her review of medical records and discussions with the nursing staff, Relator knows that this patient was and is not now homebound and is therefore ineligible for home health care services per Medicare guidelines.

107.    An OASIS Recertification form was completed contemporaneously with the care provided on May 26, 2014, for the certification period of March 28, 2014 – May 26, 2014.

108.    Upon receipt of a Medicare ADR, Kumar Govind, after up-coding the CMS Form-485 Plan of Care form, ordered Relator to change the Case Conference and 60 Day Summary report as well as falsify the OASIS Addendum Page. All of these falsified medical records were then submitted by Kumar Govind to Medicare in response to their ADR in order to assure that Defendants were paid by Medicare. Additionally, an OASIS Recertification form was completed contemporaneously with the care provided on July 22, 2014, for the certification period of May 27, 2014 – July 25, 2014, as well as a Case Conference and 60 Day Summary report.

109.     Upon receipt of a Medicare ADR, Kumar Govind, after up-coding the CMS Form-485 Plan of Care form, ordered Relator to change the Case Conference and 60 Day Summary report  and the OASIS Addendum Page, so that they would match the up-coding that Kumar Govind had done and support payment by Medicare.

110.     Kumar Govind also ordered Relator to prepare an internal communication, known as 'K-mail', to make it appear as if the medical record had been completed on July 11, 2014, when it in fact was prepared on October 3, 2014.  Kumar Govind then submitted all of the aforementioned falsified documentation to Medicare in response to their ADR in furtherance of Defendants' scheme to defraud Medicare.

111.     Evidence of manipulation and falsification of medical records, such as those described above, can be observed when accessing the company's computer systems as each time an electronic medical record is opened a Work Log is maintained on the system.  The Work Log identifies which employee within the office has entered the computer system and made any changes to a patient's medical record.

**Medicare Patient ID 157862060D1)**

112.     This patient was brought on service on March 5, 2011, and remains on service to this day.  Relator, based on her position as the Office DON, knows that numerous medical records involving this patient have been falsified and submitted to Medicare in response to ADR's.

113.     An OASIS Addendum Page, dated June 16, 2014, was completed contemporaneously with the care provided on that date.  Upon receipt of a Medicare ADR, Kumar Govind ordered Relator to falsify the OASIS Addendum Page that would be submitted to Medicare.

114.   A Skilled Nurse Visit document dated June 23, 2014, was completed contemporaneously with the care provided for services that were not needed.  Kumar Govind used falsified codes, such as Hypertensive Kidney disease and chronic kidney disease, to justify billing Medicare for these unneeded services.  Relator was ordered by Kumar Govind to falsify a Skilled Nurse Visit that would be used in lieu of the actual document when submitting medical documentation to Medicare.

115.   Relator, under duress and fearful of losing her position, would do as directed by Kumar Govind and falsify this, and other documentation, so that it would match the up-coding by Kumar Govind on the CMS Form-485 form, or she would be directed by Kumar Govind to "make up" information so that it would appear that the patient was worse off than they actually were.

116.   Upon being ordered by Kumar Govind to falsify a Case Conference and 60 Day Summary dated August 11, 2014, Relator wrote extensively in the Current Medical Necessity and Team Coordination section so that the document would match the falsified CMS Form-485 that had been up-coded by Kumar Govind.  Upon completion of these falsified medical records, Kumar Govind submitted them to Medicare in response to the ADR that had been received by Care Plus Home Health Care.

**Medicare Patient ID CPHC1018**

117.   The patient received a skilled nurse visit on September 29, 2014.  During the visit the nurse did not perform any wound care services as noted in the Nursing Visit Record.  Upon discovering that the nurse had not performed wound care, Kumar Govind told Relator that he could not bill Medicare for wound care that was not performed.  Kumar Govind then ordered Relator to change the medical record so that it would appear that the patient had received wound

care. Relator did as she was told by Kumar Govind and falsified a Wound Care Worksheet and accompanying Skilled Nursing Visit and Addendum Page to make it appear as if wound care had been performed, so Defendants could bill Medicare for a service that was not rendered.

**Medicare Patient ID 444848563A**

118.   In approximately early October 2014, Care Plus Home Health Care received an ADR from Medicare for this patient. Kumar Govind opened the patient's medical record and upon discovering that no skilled nurse with LVN supervision visit had occurred during the time period covered by the ADR, ordered Relator to falsify a Skilled Nurse Visit w/LVN supervision form utilizing the date of July 25, 2014, and making it appear as if Relator had completed the visit herself although she had not. Kumar Govind then submitted the false record to Medicare in response to the ADR.

**Medicare Patient ID CPHC927**

119.   In early October 2014, Care Plus Home Health Care received an ADR from Medicare for this patient. Kumar Govind opened the patient's medical record, and realizing the documentation would not support payment from Medicare, ordered Relator to replace the medical records completed contemporaneously with the care on August 12, 2014, with falsified documentation. Relator, under duress from Kumar Govind, reviewed the Case Conference and 60 Day Summary and replaced it with an "enhanced" version that would be sufficient to answer the ADR. Relator was also ordered by Kumar Govind to replace the OASIS Recertification completed contemporaneously with one that would match the up-coding that had been done by Kumar Govind. These falsified medical records were then submitted to Medicare in answering the ADR.

**Medicare Patient ID 565561500A**

120.    This patient is a 72-year-old patient that has been on service since June 5, 2010, and remains on service to this day.  The patient has been receiving weekly skilled nursing visits for wound care management.  According to the OASIS-C recertification form dated 9/8/2014, the Defendants list the patient's many diagnoses as follows: venous insufficiency, lower leg ulcer, Diabetes Mellitus Type II, diabetic neuropathy, hypertension, dizziness, unspecified chronic pain, generalized pain, urinary retention and long-term use of insulin.

121.    This patient has a long-standing history of ulcers needing outpatient treatment. This patient informed relator that he routinely drove over 40 miles to a wound care clinic in Tulsa, Oklahoma.  At this time, the patient has healed pressure ulcers and the caregiver has been taught to apply maintenance creams.

122.    The patient lives with his son in a rural area.  Nurses frequently complained about having to go see the patient and their notes document the home is a poor environment that was roach and vermin infested.

123.    The patient has several large dogs that were allowed to urinate and defecate in the home.  The nurses complained that when they went into the home, the carpets were sticky due to the urine and the odor penetrated their hair and clothing.  As a result, the nurses ceased making the weekly ordered visits but were continuing to complete the visit notes as if they provided the service.

124.    Relator knows that the patient and his son recently called to complain the nurses had not been to the home for two weeks.  Relator spoke to the patient directly and knows that Prasad Itty is aware the nurse is not going to the home but continues to bill for skilled nursing services.

## V. DAMAGES TO THE GOVERNMENT

125. Medicare home health services have grown rapidly in terms of program expenditures and in the number of people served as the result of changes in coverage and payment policy.[8]

126. In 2009, CMS paid a total of $18.9 billion for 3.3 million Medicare beneficiaries receiving home health services. The number of home health agencies continues to increase with approximately 11,900 total agencies in 2011.[9]

127. The Office of the Inspector General (OIG), the General Accounting Office (GAO) and other agencies raised concerns about the fraud and abuse in the Medicare home health benefit because the existing payment system did not provide the necessary incentives for high quality patient focused care.

128. In the March 2011 study titled "Report to Congress: Medicare Payment Policy,"[10] the average home health visit was calculated at $145 per visit.

129. Defendants engaged in a pattern and practice of disregarding or violating rules and regulations established by CMS which Defendants had specifically and repeatedly agreed to follow in order to receive payment for services.

130. In addition, Defendants devised a variety of schemes including but not limited to the above, that they used to falsely bill Medicare and receive payments to which they were not entitled. When Medicare or its contractors attempted to question or audit the Defendants, they created supporting documents and false records to support their fraudulent scheme.

131. Relator estimates that approximately 150 - 165 patients are on service at Defendants' Tulsa location at any given time. Based upon Relator's experience and independent

---

[8] Report to Congress: Medicare Payment Policy. Home Health Services; Chapter 8. March 2012. Pg. 213.
[9] Id at 211.
[10] March 2011 Report to Congress: Medicare Payment Policy

observations, approximately 87% of those patients are Medicare patients with the balance on Humana Medicare Advantage.

132.    Relator estimates that 60% of Defendants' patients on service are not eligible for home health care services.  Defendants' scheme to defraud Medicare has been ongoing since at least 2010 and Relator believes that it could have been going on much longer.

133.    Using the average amount of $145 per visit referenced in the aforementioned study, and the conservative 60% of patients on service with Care Plus Home Health Care not being eligible for home health care service per Relator, the United States has been defrauded by Defendants in the amount of $1,490,000/per year ($145 x 165 patients x 60% ineligible x 104 days (2 visits per patient/per week)) for at least 5 years or $7,450,000.

134.    Defendants continue to defraud the government to this day.  Absent government action, Defendants will continue their fraudulent scheme with no end in sight.

## VI.    THE FALSE CLAIMS ACT

135.    The False Claims Act (FCA), as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person. - 31 U.S.C. § 3729(a)(1)

136.    The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

137.     No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## VII.    MEDICARE

### A.    Cost Reporting and Claims Processing Procedures Under the Medicare Program

138.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services.   Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

139.     Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

140.     CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS.  42 C.F.R. § 413.64.  Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers.  Those claims are paid with federal funds.

141.     There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, hospice and home health care. 42 U.S.C. § 1395c-1395i-5.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical

conditions or prevent them.  42 U.S.C. §§ 1395j-1395w-5.  The allegations herein involve both Parts A and B for services billed by Defendants to Medicare.

142.   Home health care is a benefit under the Medicare Part A hospital insurance program.  Under Medicare Part A, home health providers enter into an agreement with Medicare to provide health care items and services to treat terminally ill Medicare eligible patients and are subsequently authorized to bill Medicare for that treatment.   Most home health providers, including Defendants' agency, derive a substantial portion of their revenue from the Medicare Program.

143.   In order to get paid, a home health provider completes and submits a claim for payment on a designated claim form, which, during the relevant time period, was or has been designated either as a Form UB-4 or also known as a CMS-1450 form.  This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient.   The Medicare Program relies upon the accuracy and truthfulness of the UB-4/CMS-1450 to determine whether and what amounts the home health provider is owed.

144.   A key purpose of the UB-04/CMS-1450 is to protect the federal government from loss due to mistake or fraud.  Medicare has the right to audit all home health provider claims and financial representations made by program participants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  However, while home health provider claims are potentially subject to audit review, it is generally known throughout the health care industry that fiscal intermediaries do not have sufficient resources to perform in-depth audits on the majority of claims submitted to them.  For these reasons, the Medicare billing system relies substantially

on the good faith of providers to prepare and file accurate claims. To this end, the UB-04/CMS-1450 form contains the following warning:

> The submitter of this form understands that misrepresentation or falsification of essential information as requested by this form, may serve as the basis for civil and monetary penalties and assessments and may upon conviction include fines and/or imprisonment under federal and/or state law(s). Submission of this claim constitutes certification that the billing information as shown on the face hereof is TRUE, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.

145.    In order to get paid from Medicare, providers, like Defendants herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS-1450. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS-1450 to determine whether and what amounts the provider is owed.

146.    That advisory is then followed by the following "Certification," which must be signed by the chief administrator of the provider or a responsible designee of the administrator:

> CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

147.    To this end, the Health Insurance Claim Form, CMS 1450, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or

were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

148.    That certification is then followed by the following "Notice:"

Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

**B.      Conditions of Participation and Conditions of Payment**

149.    To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

**C.      Medical Necessity and Appropriateness Requirements**

150.    One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

151.    Various claims forms, including the Health Insurance Claim Form, require the provider certify that the medical care or service rendered was medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records. Id. See also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

152.    The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**D.    Obligation to Refund Overpayments**

153.   As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement.  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. *See also* 42 C.F.R. §§ 489.40, 489.31.

154.   In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.

155.   Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u and 42 C.F.R. § 489.20(g).

156.   Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).   In such cases, the overpayment is subject to recoupment.   42 U.S.C. § 1395gg.  CMS is also entitled to collect interest on overpayments.  42 U.S.C. § 1395l(j).

**VIII.  TRICARE**

157.   Tricare is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

158.   Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.).

159.   Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).

160.   TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records.  32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## IX.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

161.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 160 of this Complaint as if fully set forth herein.

162.   By and through the fraudulent schemes described herein, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

163.   The United States paid the false claims described herein.

164.   Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States through Medicare, Tricare or other government insurance programs for such false or fraudulent claims.

WHEREFORE, Relator, on behalf of the United States of America, demands judgment against the Defendants, ordering that:

a) Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b) Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

c) Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and,

d) Relator be awarded such other and further relief as the Court may deem to be just and proper.

## SECOND CAUSE OF ACTION
### Making or Using False Record Statement to Cause Claim to be Paid
### 31 U.S.C. § 3729(a)(1)(B)

165. Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 160 of this Complaint as if fully set forth herein.

166. As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

167. Defendants knowingly made or used false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

   (a) false "OASIS" patient care assessments designed to inflate Medicare prospective payments;
   (b) false claims for therapy services that were unnecessary, never performed, or both;
   (c) false records containing patient OASIS information recorded by unqualified or unauthorized personnel;
   (d) false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

168. By virtue of the false records or statements Defendants made or used, the United States Government paid claims it otherwise would not have or should not have and has suffered substantial monetary damages.

**WHEREFORE**, Relator, on behalf of the United States of America, demands judgment against the Defendants, ordering that:

a) Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' and actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b) Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

c) Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and,

d) Relator be awarded such other and further relief as the Court may deem to be just and proper.

### THIRD CAUSE OF ACTION
### Making or Using False Record Statement to Avoid an Obligation to Refund
### 31 U.S.C. § 3729(a)(1)(G)

169.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 160 of this Complaint as if fully set forth herein.

170.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., false "OASIS" patient care assessments, false claims for therapy services, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Tricare.

171.    The false certifications, CMS forms, medical records, and other representations made or caused to be made by Defendants – which were material to an obligation to pay or transmit money to the Government, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

172.    Defendants knowingly made or used false records or statements in direct response to government audits, ADRs, claims submission or otherwise in the regular course of their

business dealings in order to hide their fraud upon on the government and minimize the extent of

their liability to the government.

173.    By virtue of the false records or statements Defendants made or used, the United

States Government has suffered substantial monetary damages.

**WHEREFORE**, Relator, on behalf of the United States of America, demands judgment

against the Defendants, ordering that:

a) Pursuant to 31 U.S.C. § 3729(a), Defendants and Defendant Physicians pay an amount
equal to three times the amount of damages the United States of America has sustained
because of Defendants' and Defendant Physicians' actions, plus a civil penalty of not less
than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or
require for each violation of 31 U.S.C. § 3729, *et seq*;

b) Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the
False Claims Act and/or any other applicable provision of law;

c) Relator be awarded all costs and expenses of this action, including attorneys' fees as
provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and,

d) Relator be awarded such other and further relief as the Court may deem to be just and
proper.

**TRIAL BY JURY IS HEREBY REQUESTED**

Dated this ___7th___ day of ~~April~~ *May*, 2015.

Respectfully submitted,

BY: _____

John Nicks, Esq. (OBA No. 6678)
john@cbb-law.com
Crutchmer & Barnes, P.L.L.C.
1648 S. Boston Avenue, Suite 100
Tulsa, OK  74119
(918) 382-8686 Telephone
(918) 382-8685 Fax

James D. Young (FBN 567507) *(Pro Hac Vice to be filed)*
jyoung@forthepeople.com

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Fax

John Yanchunis (FBN 324681) *(Pro Hac Vice to be filed)*
jyanchunis@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 318-5169 Telephone
(813) 222-4793 Facsimile

*Attorneys for Plaintiff/Relator*